Lorenzo Zerillo v. Commissioner. Frances G. Zerillo v. Commissioner.
Zerillo v. Commissioner
Docket Nos. 50014, 50015.
United States Tax Court
T.C. Memo 1956-180; 1956 Tax Ct. Memo LEXIS 113; 15 T.C.M. (CCH) 947; T.C.M. (RIA) 56180; July 31, 1956
*113 Joseph L. Alioto, Esq., 111 Sutter Street, San Francisco, Calif., for the petitioners. Charles W. Nyquist, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax for each of petitioners in these consolidated proceedings, as follows: Year Ended
Tax
Deficiency
March 31, 1944
Income and Victory
Tax
$21,109.83
March 31, 1946
Income Tax
2,780.92
March 31, 1947
Income Tax
1,121.57 By amended answer respondent seeks to increase the deficiencies determined for the year ended March 31, 1944 by $26,844.74. The principal issue raised by the petition is whether respondent erred in reallocating the proceeds of sale of a winery between wine inventory, gain on which is concededly taxable as ordinary income, and the winery plant and equipment, gain on which is taxable only as capital gain. For the year ended March 31, 1947, respondent's disallowance of a bad debt loss is also in issue. Other issues were settled by oral stipulation necessitating a Rule 50 computation. By amended answer an issue is raised whether the sale occurred during the year ended March 31, 1944, or *114 the year ended March 31, 1943, as reported. Findings of Fact Some facts were stipulated and are found accordingly. Lorenzo, hereafter referred to as petitioner, and Frances G. Zerillo were husband and wife during the years in controversy. All transactions involve petitioner, and Frances G. Zerillo is here solely because their returns were filed on the community property basis. All income was community income. They filed separate returns for each fiscal year ended March 31 on an accrual basis with the collector of internal revenue for the first district of California. The Riverbank Canning Company, sometimes herein referred to as the Canning Co., of which petitioner was president and controlling stockholder, packed large quantities of tomato and other vegetable products. It shipped its products on the Santa Fe Railway. Petitioner held all of the stock, except 15 or 16 per cent which he had given to his sons. He made all decisions without consulting anyone. He also engaged in other business ventures relating to growing, packing, and shipping of produce. Petitioner had been in the wine business since childhood, and had continuously operated his own winery since the year prior *115 to repeal of Prohibition. He employed Victor Luisi to manage the winery. The winery books were also kept on an accrual basis. After 1936 the winery was located in a brick building leased from the Riverbank Canning Company for $500 including the equipment therein. After repeal petitioner purchased new winery equipment piecemeal. To secure a loan, on January 15, 1942 he transferred the equipment to the Canning Co. He made one payment of $2,600 on March 27, 1943, and three payments totaling 15,938.58 during May and June of 1943. Loans between petitioner and the Canning Co. occurred frequently. At a meeting of the Canning Co's directors on July 6, 1943, attended by petitioner, it was explained that he had paid the corporation the full purchase price under the contract, and since the equipment was subject to a mortgage lien, it should be released from the lien. The directors resolved that the Canning Co. give petitioner a bill of sale and take any necessary steps to have the equipment released from the lien. Under date of September 2, 1942, petitioner had notified the Alcohol Tax Unit that the Canning Co. owned the equipment which it had leased to himself personally. Petitioner never *116 transferred his winery bond and license to the Canning Co. The Canning Co. carried the equipment on its books at $18,538.58. Petitioner bought a building, hereafter referred to as the ice plant, from the Santa Fe Railway. The ice plant was a corkinsulated, brick building located on a siding near the Canning Co. which the railroad used for storing ice. Although the ice plant originally cost $600,000, petitioner contracted to pay only $55,000. Petitioner bought it to use for his winery, but never moved the winery into the building. The Canning Co. used it as a warehouse for its heavy wartime production. In 1934, the year after repeal, the wine industry experienced mild prosperity. Steadily rising demand marked the following years. Because the wine supply exceeded demand from 1935 through 1941, the industry suffered from a poor financial situation, with 1938 being a more desperate year. In 1938 several efforts were made to save the industry. The State of California originated a program to manufacture 45 per cent of the wine grapes into brandy. The United States Department of Agriculture purchased raisins for the relief and school lunch programs. It also established a marketing agreement *117 for Tokay grapes. Wine companies formed three groups: major wineries, including Roma, Italian Swiss Colony, Petri and other nationally-advertised companies, co-op wineries, and smaller wineries. Some of the latter two groups formed the Central California wineries, or C.C.W., which attempted to restore market order by controlling marketing and pricing. The Justice Department and congressional committees investigated alleged collaboration between C.C.W., the major wineries, and the Bank of America. Due to the investigations and improved market conditions, C.C.W. disintegrated and disappeared in 1941 or 1942. In 1941 and 1942 large national distillers purchased major California wineries for comparatively high prices, although they were somewhat run-down physically. Little capital had been invested from 1938 through 1941. The distillers bought wineries primarily to retain or broaden their sales bases, there being the possibility of a continuing shortage of spirits. The influx of eastern capital tended to create, at least temporarily, a scarcity of good large operating wineries. All but one distiller later left the wine industry. The wine industry is seasonal, the crushing period *118 averaging 90 days beginning in late August or September. The 1941 crush was the largest on record: 1,120,000 tons. The 1942 crush was among the smallest: 610,000. The decrease was attributable to a War Food Administration order that all raisin variety grapes, a substantial tonnage of which are normally crushed, be converted into raisins. At the same time demand increased greatly due to increased expendable consumer income and scarcity of distilled spirits. In May 1942 the Office of Price Administration established ceiling prices for sales of bulk and bottled wines based on the highest market price in March 1942. It never placed ceilings on sales of wineries. The first ceilings on bulk red sweet wine averaged 32 cents a gallon. In the fall of 1942, the ceiling was raised to range from 39 to 51 cents a gallon. The maximum ceiling on dry red or white wine varied from 24 to 27 cents a gallon. Ceilings on bottled wines varied more, some brands selling for as much as 50 cents a gallon more than others. Some wineries arranged to have their wine bottled under brand names with higher ceilings by bottling it themselves or shipping it to a bottler to pack for them. The minimum price for sales *119 of any volume late in 1942 was 75 to 80 cents. As the war continued, the reflected return for bulk wine ranged up to $3. Very little wine was sold at bulk ceilings. The ceiling on unfinished wine was removed from November 25, 1942 to February 15, 1943, when sweet wine sold for about 75 cents a gallon. Most bottlers were located outside of California. Faced with diminishing supplies of bulk wine, bottlers communicated with California wineries by mail, telegraph, telephone, and in person to secure wine. They were, generally, unsuccessful because of the low ceilings. Other bottlers obtained wine by purchasing wineries with their inventories. They purchased fifty or sixty wineries, representing more than half the volume of the industry, beginning in late 1942. During this period new winery buildings and equipment were unobtainable. Some sales of wineries were made to bottlers and others not based entirely on a need for wine. Some purchasers retained the purchased facilities, either because they could not sell or did not want to sell. In March 1943 Edward Bragno approached petitioner to purchase his winery. He was later joined by Joseph Gentile. Bragno primarily was trying to locate *120 a supply of wine. Petitioner engaged an attorney to handle the negotiations, who held several conferences at his office and at the office of the attorney for the buyers. Besides the attorney, petitioner, Bragno, and Gentile, a representative of the Santa Fe Railway was sometimes present. The same attorney did not represent petitioner before the Alcohol Tax Unit. Petitioner made only the down payment on the purchase of the ice plant. On January 31, 1943 he owed the railroad $50,000 principal and $2,000 interest, but had never been pressed for overdue payments. Since the railroad contracted to sell the ice plant at a bargain price to secure his extensive cannery shipping business, petitioner felt obliged to inform them of the impending sale. The railroad agreed to the assignment of the purchase contract to Bragno as of April 1, 1943. Petitioner did not condition his payments to the railroad on its acceptance of the assignment. During the negotiations, questions of price and allocation arose. The attorney informed the buyers that petitioner would not sell above the applicable ceiling prices. He refused to look at an allocation prepared by the attorney for the buyer. After such conversations *121 the agreement was executed. The attorney advised petitioner on April 2, 1943 to write to Bragno to confirm the allocation based on bulk ceiling prices: 250,000 gallons of sweet wine at 47 cents a gallon, 25,000 gallons of dry white wine at 27 cents a gallon, 25,000 gallons of dry red wine at 23 cents a gallon, and the ice plant, land and equipment at $170,000. The letter was sent to Bragno on April 9. Respondent allocated $228,047.61 to the inventory, averaging about 76 cents per gallon. Petitioner's allocation of $130,000 to the 300,000 gallons averaged 43.33 cents per gallon. Petitioner and the buyers signed a document entitled "Memorandum of Contract," dated March 25, 1943. It related the terms and conditions arrived at in the negotiations, but did not allocate the price. It called for prompt execution of a bill of sale, promissory note, chattel mortgage, deed of trust, pledge agreement, and other necessary papers. The sale was to be consummated as of April 1, 1943. No other contract of sale was contemplated, negotiated, or executed. The form was chosen by petitioner's attorney as standard for a contract of sale. Petitioner's attorney requested and received a letter from *122 Bragno, dated May 25, 1943, acknowledging that 100,000 gallons were unfinished and 50,000 gallons were partly finished. The attorney prepared all required documents to take effect as of March 31, 1943, although the actual execution occurred later. Insurance premiums were prorated as of that date. The insurance endorsement was dated September 16, 1943. The attorney delivered the documents to the attorney for the buyers on April 17, 1943. The published "Notice of Intended Mortgage" of the equipment by the buyers to petitioner was dated April 8, 1943. The "Notice of Intended Sale" of the equipment pursuant to California law filed April 9, 1943, stated that the sale would be consummated on April 17, 1943. Petitioner gave Luisi a power of attorney in regard to the winery, but never specifically authorized him to make affidavits. Petitioner retained the right to fill some prior commitments, but did not operate the winery for himself after cessation of operations on March 31, 1943. Petitioner and Luisi operated the winery for Bragno in April and May of 1943. To operate a winery the owner must post a bond, after which the required license is issued. After a winery is sold, the old bond *123 and license remain in effect until a new one is secured. Petitioner notified the Alcohol Tax Unit of the sale, but that office neither revoked the license, nor required cessation of operations. In June 1943 an Alcohol Tax Unit inspector was told the sale was not yet complete. On July 21, 1943, the Canning Co. leased space to Bragno for 1 year commencing August 1, 1943, or whenever Bragno secured his license, if after August 1, 1943. Bragno posted his bond and secured his license on September 13, 1943. Petitioner operated the winery on Bragno's behalf under his own license until September 13, 1943 to protect his investment, although he regarded the transfer as complete. In September 1943 a written agreement was made for petitioner to operate the winery for Bragno. Several days after the March 25 document was executed, petitioner refused a $400,000 offer for the winery because he considered the winery already sold. Petitioner's books and a certified audit report for 1943 reflect the sale of the winery as of March 25, 1943. Exclusive of the wine sold with the winery, petitioner's books show sales of 396,593 gallons for $297,957.11, averaging 75.13 cents per gallon. Cost of all wine *124 sold by petitioner during that year was 49.66 cents per gallon. The inventory value of finished wine retained after the sale was 31.30 cents per gallon. An entry dated December 31, 1943 on the buyer's books allocates $130,000 to inventory and $170,000 to the land, ice plant and equipment. An entry dated March 31, 1944 increased the inventory value by $98,047.61 and reduced the valuation of the ice plant accordingly. The adjusting entry is explained as adjusting building and wine to fair market value at acquisition. In a protest to an internal revenue agent's report, petitioner asserted that the sale occurred in the fiscal year ended March 31, 1944. The allocation claimed by petitioner represents the correct allocation which occurred on the sale of the winery. Prior to March 31, 1947 petitioner loaned money to T. Porcaro on two unsecured notes. Petitioner believed that Porcaro would be financially ruined if he did not obtain some money. Out of sympathy for Porcaro's situation, petitioner made the loan. He relied on Porcaro's word that the notes would be paid. Porcaro paid one note. Petitioner claimed a bad debt deduction for the other in the amount of $1,121.11 in the year ended *125 March 31, 1947. When the loan was made Porcaro owned a home, a winery and other property. Petitioner did not investigate Porcaro's property holdings when the note remained unpaid. Petitioner frequently requested payment. He inquired among Porcaro's friends as to his ability to pay, and was told that Porcaro had also borrowed from them. During the year ended March 31, 1947, Porcaro's financial situation was bad, and he became involved in litigation. On advice of his attorney, petitioner never sued on the note, believing in good faith that a suit would be futile. Petitioner did not suffer a bad debt loss of $1,121.11 in the year ended March 31, 1947, on the note from Porcaro. Opinion Because of the operation of the Current Tax Payment Act of 1943, [1] a year not apparently before us is involved in the first question. Petitioner having reported the sale of his winery in the fiscal year ended March 31, 1943, respondent has determined that this was incorrect and that the sale actually took place in the following fiscal year. That is the first issue. Ordinarily if it were decided in favor of petitioner the consequence would be to eliminate any deficiency for the fiscal year ended *126 March 31, 1944 since no deficiency was determined for the fiscal year 1943 and none is mentioned in the petition. However, the interplay of the 2 years makes any tax due for 1942, or a fiscal year including that calendar year, relevant in dealing with tax liability for the following year. *127 The first question accordingly is whether petitioner was on an accrual basis and if so, whether the sale of his winery was properly accruable as of March 25, 1943. We think it was. Not only was it stipulated that the winery books were kept on an accrual basis but petitioner's tax returns for both of the years in issue state that they are being made on an accrual basis. Certainly if the evidence were otherwise the burden was upon respondent to show it under these circumstances. It may be that petitioner's personal books as contrasted with the business books of the winery might have some significance. ; ; , reversed on other grounds (C.A. 4) . But no evidence was introduced by respondent as to whether such books existed or, if they did, as to the system employed. We think that for present purposes it must be assumed that petitioner was on an accrual method. By the contract of March 25, 1943 it seems clear that all obligations of the respective parties became fixed. There were no stipulated conditions to be performed before any *128 liability to sell would arise on the one side, or liability to purchase on the other. ; ; . Certain formalities were required to complete the transaction as is customary in the sale of any business or complicated property. But these appear to have been merely of a routine nature and were ineffectual to circumscribe the finality of the transaction already entered upon. Under these circumstances the sale was complete for purposes of an accrual basis taxpayer in petitioner's fiscal year ended March 31, 1943. ; , certiorari denied ; , reversed on other grounds (C.A. 4) . The second issue is the extent to which the property sold was inventory taxable as ordinary income, or real property and equipment which the parties agree is *129 subject to the capital gain provisions. Petitioner contends, we think correctly, that the agreement of the parties eliminates any further question. , reversed on other grounds (C.A. 10) ; see . Cf. . While the agreement itself fails to specify any allocation of the purchase price, contemporary conversations are explicit. The evidence shows that by repeated oral statements, and finally by letter, the parties agreed that the wine, which constituted the inventory, was being sold at O.P.A. ceiling prices and that the balance of the purchase price was to be paid for the capital assets. There seems no dispute as to what these ceiling prices were, and even if there were nothing more, the amount for which petitioner sold his wine on the one hand and his productive facilities on the other would be clear. In addition, however, both parties set the transaction up on their books in identical fashion and in accordance with the agreement. It is true that sometime later the buyer amended his book entries. *130 But emphasizing the contemporary character of the original entries, we think they tend to confirm the arrangements to which petitioner testified and which the negotiations of the parties established. In the case of , a similar transaction had been held by the Tax Court in a Memorandum Opinion [ not to represent the true arrangement of the parties. The Court said: "The determination of whether the written contract reflected the real agreement between the parties was a question of fact and the Tax Court's finding with respect thereto is final if based upon substantial evidence." * * * In the present case we find no substantial evidence to indicate that the agreement between the parties was not the true transaction. There is no evidence here, for instance, as there was in the Particelli case, that the buyer estimated the value of the winery at anything less than the agreement called for, nor indeed that he made any estimate whatever. There is no evidence, as there was in the Particelli case, that within the year the winery was sold for a very much lower price. In the Particelli case the *131 Court states further: "The total purchase price was arrived at through arms length negotiation but the allocation of the selling price to the two pieces of property involved was not." We do not think on the record that that can be said in this case. Petitioner's advantage in attributing a low price to the wine was presumably compensated by the disadvantage to the buyer in not giving himself a higher cost of goods sold. Nevertheless, the negotiations with respect to allocation were the result of arm's length and persistent declarations by petitioner's representative that this part of the transaction would be insisted upon. The Particelli opinion refers to "The fact that Tiara [the purchaser] charged petitioner $1,000 for 1,000 gallons of wine withdrawn by him before the sale was closed" as being "strong evidence that the parties really intended and understood that the selling price of the wine was approximately $1 a gallon rather than the nominal price contained in the contract." There is no similar evidence in the present record. Reference is also made in the Particelli case to the fact that the Tax Court "does mention testimony admitted without objection * * * of a sale where *132 petitioner was said to have sold 100,000 gallons of wine at an overceiling price." There is no evidence here either that petitioner obtained higher than ceiling prices for his wine at any time or that he violated O.P.A. regulations. Finally, the Particelli case refers to the refusal of the Tax Court "to credit petitioner's testimony on this point" and "to the testimony of witness Alberigi to the effect that petitioner told him that he, petitioner, had sold his wine at $1 a gallon and had also sold the winery in order to make it legal under the O.P.A. regulations." There is no comparable testimony in this case and the record reveals no ground for refusing to credit petitioner's testimony. On the question of fact thus posed we have accordingly found that the respective assets were sold for the prices set forth by the agreement of the parties. We agree with respondent, however, that as to the transaction with Porcaro petitioner has entirely failed to show that any debt became worthless in the taxable year. Whether the original arrangement was a true loan or more in the nature of a gift to an indigent friend or whether, if not, the debtor continued *133 to be good for the amount involved, at least in the long run, we find it unnecessary to consider. Whatever the details, we are satisfied that the amount in question was apparently as collectible during the tax year as it had been theretofore. On this issue respondent is sustained. Decisions will be entered under Rule 50. Footnotes
1. SEC. 6. RELIEF FROM DOUBLE PAYMENTS IN 1943. (b) Tax for 1942 Greater Than Tax for 1943. - In case the tax imposed by Chapter 1 of the Internal Revenue Code upon any individual * * * for the taxable year 1942 (determined without regard to this section * * *) is greater than the tax for the taxable year 1943 (similarly determined), the liability of such individual for the tax imposed by such chapter for the taxable year 1942 shall be discharged as of September 1, 1943 * * * In such case the tax under such chapter for the taxable year 1943 shall be increased by - (1) the amount by which the tax imposed by such chapter for the taxable year 1942 (determined without regard to this section * * *) exceeds the tax imposed by such chapter for the taxable year 1943 (determined without regard to this section * * *), plus (2) if the tax for the taxable year 1943 (determined without regard to this section * * *) is more than $50, an amount equal to 25 per centum of the tax for the taxable year 1943 (so determined) or the excess of such tax (so determined) over $50, whichever is the lesser. Such amount shall in no case exceed 25 per centum of the tax for the taxable year 1942 (determined without regard to this section * * *) or the excess of such tax (so determined) over $50, whichever is the lesser. * * *
(g) Use of Term "Taxable Year". - For the purposes of this section the terms * * * "taxable year 1942", and "taxable year 1943" mean, respectively, the taxable year beginning in * * * 1942, and 1943, respectively; * * *↩